# Laurie L. Ames *v.* Sears, Roebuck and Company (3425)

Dupont, C. J., Daly and Bieluch, Js.

Argued June 11—decision released August 26, 1986

*Philip S. Walker,* with whom, on the brief, was *Kirk D. Tavtigian, Jr.,* for the appellant-appellee (defendant).

*Frank N. Eppinger,* with whom, on the brief, was *Peter J. Bartinik,* for the appellee-appellant (plaintiff).

DUPONT, C. J. In this products liability action,[1] the defendant appeals from the judgment rendered by the trial court following a jury verdict for the plaintiff.[2] Certain facts presented to the jury are not disputed by either party. The plaintiff, a fourteen year old girl, was operating a riding lawnmower, which had been sold by the defendant, at the home of relatives when she was injured. She had often operated the lawnmower while staying with her relatives and had been instructed in its use and operation by them. While making a turn on a blacktop driveway, the plaintiff was distracted and drove the lawnmower onto an incline on the lawn. At this point, the lawnmower's steering wheel began to shake violently and the plaintiff lost control of the machine. She then fell off the lawnmower and rolled backwards as the machine continued its turn on the incline. As the lawnmower began moving toward the plaintiff, she reached out with her right arm, in an attempt to deflect the course of the mower. The machine then drove over the left side of the plaintiff's chest, and its revolving blade made contact with her left arm, severely cutting and disfiguring it.

[1] The parties agreed that General Statutes §§ 52-572m through 52-572r would govern the determination of the plaintiff's action, although the injuries sustained by the plaintiff occurred prior to the passage of Public Acts 1979, No. 79-483, now codified as General Statutes §§ 52-572m through 52-572r.

[2] At the time this action was brought, the plaintiff, Laurie L. Ames, was a minor. Accordingly, the action was brought through her mother. During the pendency of the trial, the plaintiff reached her majority of eighteen years of age.

As a result of the accident, the plaintiff brought suit against the defendant and her relatives.[3] The jury returned a verdict for the plaintiff in the amount of $250,000. The jury also found contributory negligence of thirty percent on the part of the plaintiff. As a result, judgment was rendered for the plaintiff in the net amount of $175,000.

On appeal, the defendant raised the following claims: (1) that the trial court erred in instructing the jury that they could find that the lawnmower involved in the accident was defective because the defendant had failed to warn that the lawnmower did not have a deadman's control,[4] and in instructing the jury that the existence of a deadman's control on other lawnmowers could be evidence that the defendant's lawnmower was defective; (2) that the court erred in prohibiting the defendant from introducing into evidence a settlement agreement between the plaintiff and the owners of the lawnmower because General Statutes § 52-216a, which allows such settlements to be introduced into evidence in a trial to the court but not in a trial to the jury, violates the equal protection clause of the fourteenth amendment to the United States constitution; (3) that the court erred in admitting into evidence, under the learned treatise exception to the hearsay rule, written materials which were not authoritative reference works; and (4) that it erred in admitting into evidence a videotape portraying the operation of a deadman's control on a later model lawnmower. The plaintiff cross appeals from the judgment, claiming that the trial court erred in its failure to charge the jury on her claim for punitive damages.

[3] The suit against her relatives was subsequently settled for $25,000, the action withdrawn as to them, and a substitute complaint against the defendant was filed.

[4] A deadman's control is a device which stops the blades of a lawnmower from rotating when the mower is not being operated.

The defendant's first claim of error involves the trial court's instructions to the jury. The defendant argues that the evidence presented at trial demonstrated that the plaintiff was aware or should have been aware that the machine did not have a deadman's control, and, therefore, that the defendant did not have a duty to warn the plaintiff of the absence of this feature. Its claim is that the court should not have instructed the jury that it could conclude that this failure to warn was a defect. The defendant also argues that the court should not have instructed the jury that they could find the mower to be defective because other mowers sold during the same period of time had a deadman's control. The defendant's claim is that in a strict products liability action, evidence of the design of other products is not relevant in determining whether the product in question is defective.

The established rule in this jurisdiction is that "[a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities." *Tomer* v. *American Home Products Corporation,* 170 Conn. 681, 689, 368 A.2d 35 (1976); see also General Statutes § 52-572q; *Giglio* v. *Connecticut Light & Power Co.,* 180 Conn. 230, 235, 429 A.2d 486 (1980); 2 Restatement (Second), Torts § 402A. Under such circumstances, the failure to warn, by itself, constitutes a defect. See *Giglio* v. *Connecticut Light & Power Co.,* supra, 236; Prosser, Torts (4th Ed.) § 99, p. 659.

In this case, the trial court properly instructed the jury that it might conclude that the defendant's lawnmower was defective because the defendant failed to warn that the machine was not equipped with a deadman's control. Whether there was a defect because of the failure to warn was a question of fact to be decided by the jury.[5] Although evidence was presented that the

---

[5] In answer to an interrogatory submitted to the jury, the jury found the mower was defective and unreasonably dangerous.

plaintiff was aware of the dangers presented by the operating mower blades, there was no evidence that the plaintiff was aware of the inherent risks involved in operating a riding mower which lacked a deadman's control. "Warnings must specifically identify for the user the danger inherent in the product's use." *Giglio* v. *Connecticut Light & Power Co.,* supra, 237. Here, there was no warning by the defendant that if the user of the operating riding mower fell from the machine, the absence of a deadman's control would result in its continuing operation, thus presenting a substantial risk that the user could be seriously injured. Under these circumstances, "[t]he defendant had a duty adequately to warn the plaintiff of this unreasonably dangerous condition." Id. Thus, the trial court's instructions to the jury on this issue were correct.

The defendant's related claim is that the trial court erred by instructing the jury that it could consider the existence of a deadman's control on other lawnmowers as evidence that the defendant's lawnmower was defective. As the basis for its objection, the defendant argues that evidence of the design of other products is not relevant in a strict products liability action in order to determine whether the product in question is defective. Evidence was presented in this case that deadman's controls were available in similar lawnmowers in the period up to, and including, 1973, the year in which the defendant's machine was produced. The testimony of the plaintiff's expert witness was that a lawnmower without such controls was defective and unreasonably dangerous, and that the defendant could have foreseen the harm which would ensue to the user of the product if the controls were absent.

In *Sanderson* v. *Steve Snyder Enterprises, Inc.,* 196 Conn. 134, 491 A.2d 389 (1985), the court addressed the related issue of whether evidence of subsequent remedial measures should be excluded where recovery

is sought under a theory of strict products liability. The court concluded that "in cases such as this where a strict products liability theory is pursued, evidence of subsequent design modifications, if shown to be related to the claimed defects, may be admitted at trial." (Footnotes omitted.) Id., 148. The court based this conclusion on the fact that the doctrine of strict liability in tort is concerned with the character of the product injected into the stream of commerce and not with the specific conduct of the defendant. Id., 147; *Giglio* v. *Connecticut Light & Power Co.*, supra, 234. " 'Subsequent change evidence may be highly probative of defectiveness because it provides a safer alternative against which to compare the allegedly defective product. Because the manufacturer's culpability is not an issue, there should be no concern that the subsequent changes will be construed as an admission of negligence. Therefore, evidence of subsequent changes may be relevant without being prejudicial in strict products liability actions.' Note, 'Subsequently Remedying Strict Products Liability: *Cann* v. *Ford*,' 14 Conn. L. Rev. 759, 769 (1982); see *Lolie* v. *Ohio Brass Co.*, 502 F.2d 741, 744 (7th Cir. 1974); *Caterpillar Tractor Co.* v. *Beck*, 624 P.2d 790, 794 (Alaska 1981); *Sutkowski* v. *Universal Marion Corporation*, 5 Ill. App. 3d 313, 319, 281 N.E.2d 749 (1972)." *Sanderson* v. *Steve Snyder Enterprises, Inc.*, supra, 147–48. If evidence of subsequent design modifications, such as a deadman's control, is relevant to the claimed defects, and, therefore, admissible, then evidence of prior or contemporaneous design features are certainly relevant and admissible to prove that the product in question was defective. The trial court properly instructed the jury that it could consider whether other mowers had deadman's controls in determining whether the defendant's lawnmower was defective.

The defendant's second claim of error is that the trial court erred in prohibiting the defendant from introducing into evidence a settlement between the plaintiff and the owners of the lawnmower. The defendant bases that claim on the ground that General Statutes § 52-216a, which allows such settlements to be introduced into evidence in a trial to the court but not in a trial to a jury, violates the fourteenth amendment equal protection clause of the United States constitution. The defendant argues that General Statutes § 52-216a imposes an unconstitutional infringement upon the right to a trial by jury as guaranteed by the Connecticut constitution and, therefore, violates the equal protection clause of the fourteenth amendment to the United States constitution.

General Statutes § 52-216a prohibits the submission of evidence to a jury concerning an agreement with any tortfeasor not to bring legal action, or a release of a tortfeasor in any cause of action, during the trial of the cause of action against any other joint tortfeasor. The statute, however, does "not prohibit the introduction of such agreement or release in a trial to the court."[6] Id. The defendant claims that this statute impermissibly denies persons asserting their right to trial by jury

[6] General Statutes § 52-216a provides: "An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. If the court concludes that the verdict is inadequate as a matter of law, it shall order an additur, and upon failure of the party so ordered to add the amount ordered by the court, it shall set aside the verdict and order a new trial. This section shall not prohibit the introduction of such agreement or release in a trial to the court."

the equal protection of law as guaranteed by the fourteenth amendment. Before reviewing the substance of this claim, we must first decide whether it is properly before this court.

An appellate court is not bound to consider a claim of error unless it was distinctly raised at trial. See Practice Book § 3063. This limitation upon appellate review applies to constitutional issues. *Roche* v. *Fairfield,* 186 Conn. 490, 505, 442 A.2d 911 (1982). " 'If a party intends to raise any claim of law which may be the subject of an appeal, he must either state the same distinctly to the court before his argument is closed or state it in a written trial brief. If this is not done, it will not be the duty of either the trial court or the apellate court to decide the claim.' Practice Book § 285A; see *Petrillo* v. *Maiuri,* 138 Conn. 557, 86 A.2d 869 (1952); Practice Book §§ 3060B, 3063. This court will not consider any claim which was neither ruled upon nor decided by the trial court adversely to the moving party. See *Petrillo* v. *Maiuri,* supra, 562." *Roche* v. *Fairfield,* supra, 505 n.14.[7]

At trial, the defendant filed a memorandum of law in support of its offer to introduce evidence of the amount of a settlement with joint tortfeasors. This memorandum alleged that § 52-216a violates the defendant's right to have all questions of fact, including the assessment of damages, decided by a jury. It specifically claimed an unconstitutional interference

[7] The defendant urges us to consider the issue even if it were not distinctly raised below because the parties have briefed it on appeal and because it involves an issue of substantial public importance. Neither of these reasons is compelling. See *Peck* v. *Jacquemin,* 196 Conn. 53, 491 A.2d 1043 (1985). It is likely that if this issue is reviewed in the future by the Connecticut Supreme Court, General Statutes § 52-216a would be held to be constitutional under the federal equal protection clause because that court has already stated that the statute does not provide for a *substantive* difference between the treatment of releases or agreements in jury trials and trials to a court. Id., 73.

with its right to trial by jury in violation of article first, § 19 of the Connecticut constitution and the seventh amendment to the United States constitution. The memorandum also stated that the statute is unconstitutional because it imposes a chilling effect upon the exercise of litigants' rights to a trial by jury, but did not refer to the equal protection clause in particular. See *United States* v. *Jackson,* 390 U.S. 570, 582, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968).

The defendant asserts that its memorandum sufficiently apprised the trial court of the equal protection argument which it now presses before this court. Our review of the record, however, reveals that no mention was ever made of the guarantee of equal protection under the fourteenth amendment. No analysis of the guarantees of the fourteenth amendment was ever made to the trial court, no case law on this issue was cited, and there is nothing to suggest that the trial court ever considered this issue in its ruling on the motion. We therefore decline to address this issue.[8]

The defendant's next claim of error is that the trial court erred in admitting into evidence, under the learned treatise exception to the hearsay rule, written materials which were allegedly not authoritative reference works. The defendant argues that the materials, which were relied upon by the plaintiff's expert witness in formulating his opinion that deadman's controls were technologically and economically feasible when the defendant's lawnmower was manufactured, did not qualify as learned treatises on the ground that no evi-

---

[8] We acknowledge those cases establishing the right of an appellate court to decide issues not distinctly raised at trial. See, e.g., *Peck* v. *Jacquemin,* 196 Conn. 53, 61–62 n.13, 491 A.2d 1043 (1985); *Roche* v. *Fairfield,* 186 Conn. 490, 442 A.2d 911 (1982). Exercise of this right, however, lies within the discretion of this court. The defendant has presented no exceptional circumstances which were not apparent at trial to compel us to exercise such discretion in this appeal.

dence was presented, other than the expert's own testimony, that the materials were authoritative reference works.

The rule in this jurisdiction regarding the use of learned treatises is that if a "treatise is recognized as authoritative by an expert witness and if it influenced or tended to confirm his opinion, then relevant portions thereof may be admitted into evidence in the exercise of the trial court's discretion." *Cross* v. *Huttenlocher,* 185 Conn. 390, 395, 440 A.2d 952 (1981); see also *Kaplan* v. *Mashkin Freight Lines,* 146 Conn. 327, 334–35, 150 A.2d 602 (1959); Tait & LaPlante, Connecticut Evidence §§ 7.16f (4), 11.19. The written materials objected to by the defendant in this case were five technical papers on the subjects of accidents and injuries involving riding lawnmowers and the design and operation of riding mowers and small tractors. Three of the documents were engineering studies prepared for presentation to the American Society of Agricultural Engineers.

At trial, the plaintiff's expert witness testified that he considered the papers to be authoritative on the subject of lawnmower safety and that he relied on the documents in formulating his opinions concerning the defendant's lawnmower. Furthermore, the defendant conducted an extensive voir dire of the witness in order to determine whether he considered the materials to be authoritative. This testimony satisfied the requirements for the admission of the documents under the learned treatise exception to the hearsay rule. See *Cross* v. *Huttenlocher,* supra; Tait & LaPlante, supra. Under these circumstances, the trial court was correct in admitting the materials into evidence.

The defendant's fourth claim of error is that the trial court erred in admitting into evidence a videotape portraying the operation of the deadman's control on a

later model lawnmower. At trial, the plaintiff introduced into evidence a videotape of two riding lawnmowers. The first machine was similar to the one involved in the accident and the second machine was a 1983 model lawnmower which was equipped with a deadman's control. The videotape was admitted for the purposes of explaining the device to the jury and demonstrating to the jury how the deadman's control operated. Prior to viewing the videotape, the trial court gave a limiting instruction to the jury concerning its use.[9] The videotape was then used by the plaintiff's expert witness in conjunction with his testimony.

[9] The trial court's instructions to the jury on this issue are as follows: "THE COURT: Now, ladies and gentlemen of the jury, we're about to start the evidence again. It's my understanding the Plaintiff is going to put on [her] expert witness today, and he had—the Plaintiff has provided the Court for your benefit a videotape which the expert will use in his testimony. Basically the videotape shows a picture of two lawnmowers, one a Craftsman, the one involved in this particular episode. The identity of the other is unimportant to this case, so you don't have to be concerned with the identity of the lawnmower. The only purpose for this second lawnmower is to illustrate to you how a deadman's switch operates on that particular lawnmower. Whether there's any other way they operate I don't know, but the expert will probably testify.

"I want you to understand that you are not to draw any conclusions as to the defect or unreasonable condition of the lawnmower involved in this case merely from the fact that there is a deadman's switch on the second lawnmower that you see. That in and of itself—the fact that there's a deadman's switch on one lawnmower does not in and of itself mean that it should be on every other lawnmower. Do you understand that? So, the only purpose for showing you this video is to show you how it works so that you'll understand it better in your deliberations; and then when you deliberate, taking all the evidence that you've heard concerning the condition of the Defendant's lawnmower, the Craftsman, with all the instructions, with all the other evidence that you hear, it will be then for you to determine whether or not it was in a defective and unreasonably safe condition at the time it was sold.

"In your deliberations, you may or may not wish to consider whether it should have had a deadman's switch, but again what I'm trying to emphasize is the mere fact that you see a deadman's switch on this second lawnmower is not in and of itself to make you conclude that the Craftsman should have had it, and since it did not have it, it was defective and in an unreasonably safe condition at the time it was sold. Do you understand that?"

"It is well established that motion pictures, when properly authenticated and relevant to the issues in the case, are admissible in evidence in the discretion of the court. Note, 62 A.L.R.2d 686, 688. The rules which apply to the admissibility of photographs also apply to that of motion pictures, including videotapes. Scott, Photographic Evidence (2d Ed.) §§ 1294, 1297; 29 Am. Jur. 2d, Evidence § 801. Thus, if a motion picture has a tendency to prejudice the jury, the question before the court is whether its value as evidence outweighs its possible prejudicial effect." *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 323–24, 430 A.2d 1 (1980); see also Tait & LaPlante, Connecticut Evidence (1985 Sup.) § 9.5. In this case, the trial court did not abuse its discretion in admitting the videotape into evidence. The videotape assisted the jury in understanding the operation of a deadman's control and, in light of the trial court's instructions, the prejudicial effect of the videotape, if any, was minimal. Nor was the videotape the type of "staged reproduction of one party's version of the facts"; *Pisel* v. *Stamford Hospital,* supra, 324; which would be misleading to the jury. See *Hubbard* v. *McDonough Power Equipment, Inc.,* 83 Ill. App. 3d 272, 281, 404 N.E.2d 311 (1980). The evidence demonstrated the location and operation of a deadman's control on a riding lawnmower and supplemented the explanation of the device offered by the plaintiff's expert witness. The trial court has broad discretion with respect to the admission of such demonstrative evidence, and, in this case, the court did not abuse its discretion in allowing the videotape into evidence. See *Blanchard* v. *Bridgeport,* 190 Conn. 798, 806, 463 A.2d 553 (1983); *Katsetos* v. *Nolan,* 170 Conn. 637, 649–50, 368 A.2d 172 (1976).

In addition to the defendant's assignments of error, the plaintiff has filed a cross appeal in this case. She claims that the trial court erred in refusing to charge the jury with respect to the issue of punitive damages

in accordance with General Statutes § 52-240b. In her substituted complaint, the plaintiff alleged that the defendant acted recklessly in distributing the riding lawnmower when it knew or should have known of the dangers involved in placing the machine into the stream of commerce. At trial, the court instructed the jury to disregard this count of the plaintiff's complaint on the ground that there was no basis in the evidence presented to indicate that the defendant had acted recklessly. The plaintiff took an exception to the trial court's failure to charge on the issue of recklessness and punitive damages.[10]

As a general matter, "[p]unitive damages, applying the rule in this state as to torts, are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Collens* v. *New Canaan Water Co.,* 155 Conn. 477, 489, 234 A.2d 825 (1967); see also *Kenny* v. *Civil Service Commission,* 197 Conn. 270, 277, 496 A.2d 956 (1985); *Vandersluis* v. *Weil,* 176 Conn. 353, 358, 407 A.2d 982 (1978). "In fact, the flavor of the basic requirement to justify an award of punitive damages

---

[10] We note that the defendant did not file a motion to set aside the verdict on the ground that it was inadequate because the trial court instructed the jury not to consider the issue of punitive damages. Although the verdict was in her favor, the plaintiff could have filed a motion to set aside the verdict as inadequate. See *Peck* v. *Jacquemin,* 196 Conn. 53, 57, 491 A.2d 1043 (1985). Instead of filing a motion to set aside the verdict, the plaintiff merely took an exception to the trial court's refusal to instruct the jury on the issue of punitive damages. This failure to file a motion to set aside the verdict limits our consideration of this issue to determining whether there has been plain error. See Practice Book § 3063; *Pietrorazio* v. *Santopietro,* 185 Conn. 510, 515, 441 A.2d 163 (1981). " 'Such review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.' *State* v. *Hinckley,* 198 Conn. 77, 87–88 n. 10, 502 A.2d 388 (1985)." *State* v. *Franko,* 199 Conn. 481, 489–90, 508 A.2d 22 (1986); see also *State* v. *Vinal,* 198 Conn. 644, 654, 504 A.2d 1364 (1986). The plaintiff's claim of error is neither so obvious nor so egregious as to constitute plain error. *State* v. *Franko,* supra.

is described in terms of wanton and malicious injury, evil motive and violence. *Triangle Sheet Metal Works, Inc. v. Silver,* 154 Conn. 116, 128, 222 A.2d 220 (1966)." *Venturi v. Savitt, Inc.,* 191 Conn. 588, 592, 468 A.2d 933 (1983). In a products liability action, "[p]unitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product." General Statutes § 52-240b; see also *American Airlines, Inc. v. National Automatic Products Co.,* 39 Conn. Sup. 269, 271, 477 A.2d 171 (1984).

Our review of the record in this case indicates that the trial court did not err in refusing the plaintiff's request to charge the jury on the issue of punitive damages. Although evidence was presented that the defendant was aware of the existence of deadman's controls at the time its machine was produced and distributed, the failure to incorporate such a device into its lawnmower did not constitute reckless disregard for the safety of the machine's users so as to support an award of punitive damages. As a general rule, punitive damages may be awarded only for outrageous conduct. See *Triangle Sheet Metal Works, Inc. v. Silver,* supra, 128; 4 Restatement (Second), Torts § 908, comment (b). The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with "reckless indifference to the interests of others." 4 Restatement (Second), Torts, supra. The defendant's failure to install a deadman's control on its lawnmower, when such devices were not universally accepted by the industry and were not required under applicable safety standards at the time the defendant's machine was distributed, and its reliance on the product manufacturer for safety testing did not rise to the level of reckless conduct. Without the required showing of recklessness, there was no basis for the jury to

consider an award of punitive damages against the defendant under General Statutes § 52-240b. Accordingly, the trial court's instructions to the jury on the issue were correct.

There is no error.

In this opinion the other judges concurred.